## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MATTHEW BLOOM, et al.,

      Plaintiffs,

      v.

NEXTERA ENERGY, INC., et al.,

      Defendants.

Case No. 5:21-cv-04058-HLT-ADM

## MEMORANDUM AND ORDER

This case arises out of the construction of wind turbines in Kansas. Plaintiffs assert claims of nuisance and inverse condemnation against Defendants, which are various corporate entities alleged to be involved in the construction of the wind farm. Defendants filed two motions to dismiss. Both motions seek dismissal of all claims in the case for identical reasons, and one additionally seeks dismissal of three Defendants for lack of personal jurisdiction. Docs. 47, 49. For the reasons stated below, the motions are granted in part and denied in part. Plaintiffs Matthew and Rachel Bloom's nuisance claims against Defendant Solider Creek survive. All other claims and parties are dismissed.

## I.     BACKGROUND[1]

Plaintiffs own property in Nemaha County, Kansas. Doc. 60 at ¶ 2. Specifically, Matthew and Rachel Bloom own and reside on property referred to as "Farm 1," and Casey and Sharon Bloom own and manage farming operations on property referred to as "Farm 2." *Id.* Both

---

[1]    The following facts are taken from the corrected second amended complaint and are assumed to be true for purposes of evaluating Defendants' motions to dismiss.

properties are adjacent to land containing large industrial wind turbines built as part of the Soldier Creek wind farm (the "project"). *Id.* ¶ 3.

Defendant NextEra Energy, Inc. ("NEE"), is a corporation based in Florida that is engaged in wind power generation. *Id.* ¶ 4. Defendant NextEra Energy Capital Holdings, Inc. ("NECH") is likewise a Florida corporation. *Id.* ¶ 5. Defendants NextEra Energy Resources LLC ("NEER"), NextEra Energy Constructors LLC ("NEC"), NextEra Energy Operating Services LLC ("NEOS"), NextEra Energy Project Management LLC ("NEPM"), and Soldier Creek Wind LLC ("Soldier Creek") are subsidiaries of and are substantially controlled by NEE and NECH, and they "share key executive officers, decision-making processes and personnel, the same corporate headquarters offices and facilities, shared work processes, and same exact address with" NEE and NECH. *Id.* ¶ 6; *see also id.* ¶ 8. Plaintiffs allege that the "array of Defendant subsidiaries and affiliates form the same joint venture and common enterprise related to Plaintiffs' claims," which renders them jointly and severally liable for all the harm alleged in the complaint. *Id.* ¶¶ 7, 12.

The corrected second amended complaint includes the following allegations against Defendants:

- NEE "is the parent corporation to all other listed Defendants and jointly and severally participated in approval, development and the decision to develop at that location, oversight, ratification, direction, and/or supervision vis-à-vis other Defendants' actions related to the nuisances that continue to harm Plaintiffs," is "engaged in power generating and related development, sales and transmission activities on a worldwide basis, to include other locations within the United States and Kansas" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 9.

- NECH "is a parent financing and economic backing company to all other listed Defendants and jointly and severally participated in financing and economic activities directly and/or as part of a joint venture with other Defendants related to the nuisances that

continue to harm Plaintiffs" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 10.

- NEER "operates as an action arm of [NEE and NECH] providing primary oversight and an action conduit by which to direct activities throughout the entire NextEra Defendants joint venture and enterprise consisting of hundreds of subsidiaries," and "is heavily involved in all aspects of development for a new industrial wind turbine array like the massive Soldier Creek Wind LLC Project . . . in Nemaha County, Kansas at issue in this case and was directly involved both in and out of Kansas with all aspects to include but not be limited to preparation, development, the decision to develop at that location, finance, construction, compliance, regulatory and legal, public interface and communications as well as follow-on operations to include but not be limited to all aspects surrounding the turbine towers built and operated on adjoining property to Plaintiffs'" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 11.a.

- NEC: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, placement, and construction of the turbine towers that continue to harm Plaintiffs" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 11b.

- NEOS: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, and other activity concerning the development and current operations of turbine towers that continue to harm Plaintiffs" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 11.c.

- NEPM: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, and other activity concerning the development and current operations of turbine towers that continue to harm Plaintiffs" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 11.d.

- Soldier Creek "is the local subsidiary in the overall enterprise that has been involved with every aspect of the Project to include but not be limited to its development, planning, siting, finance, current operations, construction and compliance, public interface among many other activities that continue to harm

Plaintiffs" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 11.e.

The remaining allegations in the corrected second amended complaint are alleged generally against Defendants collectively. *Id.* at 6 n.1. The Court will do likewise for purposes of setting out the facts alleged in the corrected second amended complaint, with the caveat that Defendants' objection to this collective pleading style is addressed below in the analysis.

Defendants have developed, constructed, and operate a wind-energy project in Nemaha County, Kansas. *Id.* ¶ 14. Defendants are the largest producer of wind energy in the world and have knowledge and experience about the "devastation" these developments cause. *Id.* ¶ 15. Many of Defendants' "wind farms" have caused complaints and lawsuits by neighbors whose use and enjoyment of their property has been disrupted. *Id.* The towers "have three rotating 260 foot long blades and are topped with powerful navigational bright red aviation strobe lights firing in sync each few seconds throughout the entire nighttime hours that can be seen for miles across entire counties." *Id.*[2] Plaintiffs allege that wind-tower fields blanket the southern half of Nemaha County and create disturbances as well as "significant and unnatural amounts of noise and strobe light flashing at night that is especially agitating to neighbors in the normal, bird-chirping quiet and normally starlit night sky of rural Kansas." *Id.* The noises generated are often continuous and equate to "the sound of a passenger jet passing overhead that never moves out of earshot or, at other times, with deep thumping regularity akin to an approaching helicopter that never seems to land or depart the area." *Id.* The towers also create sunlight "flicker," strobe light effects, and obstruct the views of the surrounding landscape. *Id.* "Non-participating" neighbors who have

---

[2]   The corrected second amended complaint alleges elsewhere that the towers are 495 feet tall and have "400 foot rotating arms." Doc. 60 at ¶ 14.

towers built on the surrounding land have degraded family homesteads and farms, and the wind turbines are so annoying that most people would choose to not work or live near them. *Id.*

Defendants knew that Plaintiffs were non-participating landowners with properties adjacent to sites where they had been planning to construct wind turbines, and that Farm 1 had a residence on it. *Id.* ¶ 26. Plaintiffs contend that they experience noise interference and annoyance from Defendants' towers 85-90% of the time. *Id.* ¶ 16. Plaintiffs Matthew and Rachel Bloom allege that they experienced almost no traffic on the road in front of their house before the project was built. *Id.* ¶ 17. Although Defendants improved the road, traffic also increased, and Plaintiffs worry that their children will not hear approaching traffic because of the noise from the wind turbines. *Id.* Plaintiffs have also stopped seeing as many quail on their property. *Id.* ¶ 18.[3] They also notice noises, including an "eerie" sound in the form of "a loud tension, cracking, or intense rubbing noise, described as 100x bigger and more 'disturbing,' like a huge old elm tree that is twisting heavily in the wind and about to pop, shatter, or break" and "a high pitch whining of gears, like an over-stressed car transmission times a thousand." *Id.* ¶¶ 19-20. From their properties, Plaintiffs can see 40-50 wind turbines, including 16 within two miles of their properties and eight within one mile. *Id.* ¶ 20. Plaintiffs Matthew and Rachel Bloom had also planned to build an addition on the dwelling on Farm 1, but they "cannot figure out a way to do so without being subject directly to the interference and annoyance of the looming wingspan, noise, and shadow of the massive turbine tower in question." *Id.* ¶ 34.

Despite knowing the disruptive nature of "wind farms," Defendants have put them near non-participating properties. *Id.* ¶ 22. Defendants often ignore placement and siting limitations and

---

[3]   The corrected second amended complaint does not include any allegations specific to Casey and Sharon Bloom or Farm 2, other than that a wind turbine was built 600 feet from the property line. Doc. 60 at ¶ 42. However, the corrected second amended complaint includes various allegations about "Plaintiffs" generally. The Court indicates when specific individuals are referenced but otherwise will refer to Plaintiffs collectively.

bully and threaten landowners and communities who challenge them. *Id.* ¶ 23. Plaintiffs allege that Defendants misled officials in Nemaha County about the set-backs that would be observed. *Id.* ¶¶ 24-25. In reaching a Development Agreement dated February 26, 2020, Defendants represented to the Nemaha County Board of Supervisors that only seven non-participating landowners were out of compliance with agreed set-back requirements, and that all such landowners had been offered a settlement. *Id.* ¶ 25. Plaintiffs' properties were not included in that list. *Id.* Plaintiffs contend the Nemaha County Board of Supervisors signed the Development Agreement under false pretenses created by Defendants that all set-back provisions would be observed. *Id.* ¶¶ 27-28.

Plaintiffs contend that Defendants' actions have caused them to sustain "monumental and substantial annoyance, interference, and loss of the use and enjoyment of their property" and have "inhibited Plaintiffs' ability to realize the full value and use as a homestead/farmstead without substantial annoyance, interference, loss of use and enjoyment, among other damages, when trying to use the property as they would like, or sell the property, due to Defendants' nearby massive structures sited too close by." *Id.* ¶ 29. Plaintiffs allege that "Defendants knew that Plaintiffs were non-participating landowners of an adjacent parcel of land to sites on which they simply wanted to construct huge wind turbines too close to the property line and a dwelling and couldn't be bothered with whether it would cause a huge nuisance . . . ." *Id.* ¶ 31. Defendants also tried to get Plaintiffs to extend an expired land use contract signed by the prior owner of the property. *Id.* ¶ 32. Defendants "jointly and severally" had knowledge of the nuisance. *Id.* ¶ 33.

The corrected second amended complaint alleges nine claims. Counts 1-4 are for intentional private nuisance, ostensibly on behalf of each of the four named plaintiffs. *Id.* ¶¶ 36-45. Likewise, Counts 5-8 are negligent private nuisance claims. *Id.* ¶¶ 46-52. Count 9 is for "inverse condemnation under government authority." *Id.* ¶¶ 53-57. Plaintiffs allege that the wind-

turbine project in Nemaha County is a public works project done "under color of government authority" and that Defendants are liable for inverse condemnation because the placement of wind turbines with less than the agreed set-back is a taking. *Id.*

## II.   STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if it is accompanied by sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation omitted). In undertaking this analysis, the Court accepts as true all well-pleaded allegations in the complaint, though it need not accept legal conclusions. *Id.* Likewise, conclusory statements are not entitled to the presumption of truth. *Id.* at 678-79.

In the case of a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish personal jurisdiction over each defendant. *See OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998). When courts decide a Rule 12(b)(2) motion on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing of personal jurisdiction. *Id.* Courts assume the allegations in the complaint to be true to the extent not contradicted by the defendant's affidavits, and all factual disputes are resolved in the plaintiff's favor. *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011).

Conflicting affidavits or declarations are also resolved in the plaintiff's favor. *Creech v. P.J. Wichita, L.L.C.*, 2017 WL 914810, at *1 (D. Kan. 2017).

## III.   ANALYSIS[4]

### A.   Personal Jurisdiction

NEE, NECH, and NEER move to dismiss the claims against them for lack of personal jurisdiction. Doc. 49. In moving to dismiss, NEE, NECH, and NEER have submitted a declaration stating that none of those entities have offices or employees in Kansas, is registered to do business in Kansas, or own any wind turbines or wind projects in Kansas. Doc. 50-1. Plaintiffs argue that there are minimum contacts with Kansas, primarily because "NextEra Defendants at all levels have been advertising for full-time jobs in Kansas for years." Doc. 53 at 10.[5]

To establish personal jurisdiction over a defendant, a plaintiff must satisfy both the state long-arm statute and constitutional due process. *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006). But because the Kansas long-arm statute reaches as far as federal due process will allow, the issue is narrowed to whether assertion of personal jurisdiction over the defendant would violate due process. *OMI Holdings*, 149 F.3d at 1090. Due process allows a federal court sitting in diversity to exercise personal jurisdiction over a non-resident defendant only so long as there exist

---

[4]   Defendants' motions to dismiss argue in part that Plaintiffs do not have standing to assert claims based on the Development Agreement between the Nemaha County Board of Supervisors and Soldier Creek. *See, e.g.*, Doc. 48 at 4-6. Although the corrected second amended complaint discusses the Development Agreement extensively, Plaintiffs clarify in their response that they are not asserting any claims based on the Development Agreement or any set-back requirements included in it. Doc. 53 at 23-24.

[5]   In addition to arguing minimum contacts, Plaintiffs argue that the Court has personal jurisdiction over NEE, NECH, and NEER because jurisdiction over NEC, NEOS, NEPM, and Soldier Creek is not disputed, and they have alleged a joint venture/common enterprise. Doc. 53 at 8-9. But regardless of whether this is a correct statement of law, *see Creech*, 2017 WL 914810, at *6, the argument would necessarily fail because the Court finds below that Plaintiffs have not pleaded any facts that support the existence of a joint venture or enterprise. The same is true to the extent Plaintiffs contend there is personal jurisdiction over NEE, NECH, and NEER because they have pleaded direct conduct by these parties in Kansas. Doc. 53 at 9. As discussed below, Plaintiffs do not contend that any Defendants are the alter ego of the others. *See Butler v. Daimler Trucks N. Am., LLC*, 2020 WL 4785190, *4 (D. Kan. 2020).

"minimum contacts" between the defendant and the forum state. *World-Wide Volkswagen, Co. v. Woodson*, 444 U.S. 286, 291 (1980). This "minimum contacts" standard may be met in two ways—through either "specific" personal jurisdiction or "general" personal jurisdiction. *OMI Holdings*, 149 F.3d at 1090-91.

Plaintiffs do not argue that general personal jurisdiction exists over NEE, NECH, or NEER. Thus, the Court focuses on specific jurisdiction. The specific jurisdiction inquiry is two-fold. First, courts must determine whether the defendant has such minimum contacts with the forum "that he should reasonably anticipate being haled into court there." *OMI Holdings*, 149 F.3d at 1091 (citing *World-Wide Volkswagen*, 444 U.S. at 297). And, within this inquiry, courts must determine whether the defendant purposefully directed its activities at residents of the forum state and whether the plaintiff's claim arises out of actions by the defendant itself that create a substantial connection with the forum. *Id.* Second, if the defendant's actions create the requisite minimum contacts, courts must then consider whether exercising personal jurisdiction over the defendant would offend "traditional notions of fair play and substantial justice." *Id.*

### 1.    NEE

For NEE, Plaintiffs rely on some online job postings for positions in Kansas that reference NEE. Doc. 53 at 10-12. Defendants argue this isn't sufficient, and even if it could establish specific personal jurisdiction, the "web-based job listings for jobs in Kansas" are not relevant to the operative facts of this case. Doc. 57 at 9. Defendants also point out that references to "NextEra Energy" is not necessarily a reference to NEE. *Id.* at 9-10. Accordingly, the Court finds Plaintiffs have failed to make a prima facie case that this Court has personal jurisdiction over NEE.

2.     **NEER**

Regarding NEER, Plaintiffs point to job postings in Kansas under the name of NEER, the existence of employees in Kansas purporting to be employed by NEER, promotional materials sent by NEER to Kansas residents about Kansas wind turbine projects, and a storefront for NEER in Seneca, Kansas. Doc. 53 at 13-14. Plaintiffs also submit an affidavit that disputes Defendants' declaration as to NEER. Doc. 53-2.

The alleged NEER employees identified by Plaintiffs have provided declarations stating that they are actually employed by NEPM, although their business cards use a brand logo for either NEE or NEER. Doc. 57-2; Doc. 57-3. Another declaration states that the rental payments for the storefront in Seneca, Kansas were made on behalf of Soldier Creek and NEC, and that NEE, NEER, and NECH never made lease payments for the property. Doc. 57-4. Finally, a fourth declaration states that references to NEE or NEER on job postings "is a generic reference to the spectrum of NextEra subsidiaries and affiliates" and does not mean that NEE or NEER is searching for employees in Kansas. Doc. 57-1; *see also* Doc. 57 at 11-12.

Based on this conflicting evidence, the Court is not in a position to conclude that it lacks personal jurisdiction over NEER. This is because all conflicting questions of fact at this stage must be resolved in favor of Plaintiffs. *Shrader*, 633 F.3d at 1239; *Creech*, 2017 WL 914810, at *1. Accordingly, NEER's request to dismiss for lack of personal jurisdiction is denied without prejudice.[6]

---

[6]   As discussed below, however, the Court finds that Plaintiff has failed to state a claim against NEER along with all NextEra Defendants.

### 3.    NECH

As to NECH, Plaintiffs only repeat the paragraph in the corrected second amended complaint that reiterates the contention about a joint venture. Doc. 53 at 10. NECH is not otherwise mentioned, and thus the Court finds that Plaintiffs have failed to make a prima facie showing of personal jurisdiction over NECH in Kansas.

Accordingly, NEE's and NECH's motion to dismiss for lack of personal jurisdiction is granted, but NEER's request is denied without prejudice.[7]

## B.    Nuisance

NextEra Defendants argue that Plaintiffs have not stated a nuisance claim against them because they are not the owner or operator of the project in Nemaha County. Doc. 48 at 6-8; Doc. 50 at 11-13. All Defendants—NextEra Defendants and Soldier Creek—additionally argue that Plaintiffs fail to sufficiently allege the elements of nuisance on Counts 1 and 2. Doc. 48 at 8-14; Doc. 50 at 13-20. The Court first considers whether Plaintiffs have stated a claim against NextEra Defendants, and then considers whether Plaintiffs have plausibly alleged nuisance.

### 1.    NextEra Defendants

The parties don't dispute that Soldier Creek is the actual owner and operator of the wind-turbine project in Nemaha County. *See* Doc. 48 at 2, 7; Doc. 50 at 3, 13; Doc. 53 at 4-5. Next Era Defendants accordingly argue that the corrected second amended complaint does not state a claim against them because they are not the owner or operator of the project. They argue that Plaintiffs' conclusory allegation that there was a "joint venture and common enterprise" does not satisfy

---

[7]    Plaintiffs additionally argues that "at the very minimum enough of a question has been raised to compel a denial of Defendants' joint motions until after discovery is made available on these questions." Doc. 53 at 18. To the extent Plaintiffs are requesting jurisdictional discovery, the Court denies that request because it alternatively finds that Plaintiffs have failed to plead sufficient facts that would connect any NextEra Defendants to the project, as stated below, and thus has failed to state a claim against NextEra Defendants.

pleading standards and does not justify disregarding the separateness of corporate entities. Doc. 48 at 7; Doc. 50 at 12.

The Court has struggled somewhat to discern precisely the grounds on which Plaintiffs believe they can hold Defendants liable for the conduct about which they complain, especially given that it is undisputed that only Soldier Creek owns and operates the project. The corrected second amended complaint alleges that Defendants are all related through a parent-subsidiary relationship. *See* Doc. 60 at ¶¶ 4-6. But "a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity." *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974); *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law . . . that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."); *Heslop v. UCB, Inc.*, 175 F. Supp. 2d 1310, 1317 (D. Kan. 2001) ("The fact that one corporation is the parent of another, however, is not sufficient to warrant treating the two corporations as one without a showing that one exercises undue control over the internal affairs of the other.").

Nor do Plaintiffs suggest that Defendants are merely alter egos for each other or that piercing the corporate veil is otherwise necessary. *See Quarles*, 504 F.2d at 1362; *see also Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, LLC*, 28 F.4th 996, 1007-08 (10th Cir. 2022) (explaining when the "presumption of corporate separateness" can be overcome). Instead, Plaintiffs argue that they have "alleged direct liability by those individual entities' actions but also joint and several liability to all Defendants based on a joint venture/common enterprise theory." Doc. 53 at 4-5; *see also id.* at 8. But other than frequently repeating this refrain, Plaintiffs do little to actually show

this to be the case. The Court nevertheless considers each of Plaintiff's theories of liability: joint and several liability, joint venture or common enterprise, and direct liability.

### a.      Joint and Several Liability

Plaintiffs claim they have alleged joint and several liability. But simply alleging joint and several liability, *see id.* at 8, does not establish that Defendants are jointly and severally liable for the actions of the others. Joint and several liability is a legal conclusion not entitled to the presumption of truth. *See Iqbal*, 556 U.S. at 678. And there must be a legal basis to reach that conclusion, which Plaintiffs have not shown.[8]

### b.      Joint Venture or Common Enterprise

Plaintiffs also allege that Defendants are liable "based both on a joint venture and/or common enterprise theory of liability . . . ." Doc. 53 at 8. "A joint venture is defined as an association of two or more persons or corporations formed to carry out a single business enterprise for profit and may be found in the mutual acts and conduct of the parties." *Wheat v. Kinslow*, 316 F. Supp. 2d 924, 930 (D. Kan. 2003). "A joint enterprise is defined as an undertaking to carry out an act or objective which is entered into by associates under such circumstances that all have an equal voice in directing the conduct of the enterprise." *Id.* (internal quotation and citation omitted). The terms are often used interchangeably, but the primary distinction is that "a business relationship is necessary to create a joint venture, but not to create a joint enterprise." *Id.* The elements of either are essentially the same: "(1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the

---

[8]   To the extent Plaintiffs contend joint and several liability applies because the parties have formed a joint venture or common enterprise, that is addressed separately.

management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement." *Cuiksa v. Hallmark Hall of Fame Prods., Inc.*, 252 F. Supp. 2d 1166, 1178–79 (D. Kan. 2003); *see also Meyer v. Christie*, 634 F.3d 1152, 1158 (10th Cir. 2011).[9]

Although the corrected second amended complaint states that "[t]he array of Defendant subsidiaries and affiliates form the same joint venture and common enterprise related to Plaintiffs' claims," Doc. 60 at ¶ 7, Plaintiffs plead no facts that would plausibly show this to be the case. At most, Plaintiffs allege that NEER, NEC, NEOS, and NEPM, along with Soldier Creek, are subsidiaries of NEE and NECH and "are substantially controlled by and share key executive officers, decision-making processes and personnel, the same corporate headquarters offices and facilities, shared work processes, and same exact address with" NEE and NECH. *Id.* ¶¶ 4-6. But the only one of these statements backed up by an actual fact is that all Defendants have their principal place of business at the same Florida address. *See id.* ¶ 8. Further, even if these entities do share officers, personnel, and the same office space, that doesn't allege the existence of a joint venture. Plaintiffs' conclusory allegations on this point are not sufficient. *Iqbal*, 556 U.S. at 678.

### c.    Direct Liability

That leaves Plaintiffs' alternative contention that they have pleaded direct action by NextEra Defendants that renders them liable. *See* Doc. 53 at 9. On this issue, the Court again notes

---

[9]    Other courts phrase the factors used to determine a joint venture exists differently: "(1) an agreement, (2) a common purpose, (3) a community of interest, and (4) an equal right to a voice, accompanied by an equal right of control over the instrumentality." *Liechty v. Bethel Coll.*, 2020 WL 954033, at *4 (D. Kan. 2020) (quoting *Cullip ex rel. Pitts v. Domann ex rel. Domann*, 972 P.2d 776, 783 (Kan. 1999)). There is some overlap in these differently phrased factors, however. Further, the Tenth Circuit has cautioned that the factors "are not exclusive or outcome-determinative." *Meyer*, 634 F.3d at 1158. As discussed, any distinction in the factors considered is largely irrelevant in the current case because Plaintiffs plead almost no facts on this issue at all.

that the corrected second amended complaint is thin. There are only minimal allegations of direct

action by Defendants, and those allegations are highly conclusory:

- NEE "jointly and severally participated in approval, development and the decision to develop at that location, oversight, ratification, direction, and/or supervision vis-à-vis other Defendants' actions related to the nuisances that continue to harm Plaintiffs" and is "engaged in power generating and related development, sales and transmission activities on a worldwide basis, to include other locations within the United States and Kansas." Doc. 60 at ¶ 9.

- NECH "jointly and severally participated in financing and economic activities directly . . . related to the nuisances that continue to harm Plaintiffs." *Id.* ¶ 10.

- NEER "was directly involved both in and out of Kansas with all aspects to include but not be limited to preparation, development, the decision to develop at that location, finance, construction, compliance, regulatory and legal, public interface and communications as well as follow-on operations to include but not be limited to all aspects surrounding the turbine towers built and operated on adjoining property to Plaintiffs'." *Id.* ¶ 11.a.

- NEC: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, placement, and construction of the turbine towers that continue to harm Plaintiffs." *Id.* ¶ 11b.

- NEOS: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, and other activity concerning the development and current operations of turbine towers that continue to harm Plaintiffs." *Id.* ¶ 11.c.

- NEPM is, "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, and other activity concerning the development and current operations of turbine towers that continue to harm Plaintiffs." *Id.* ¶ 11.d.

As to NEC, NEOS, and NEPM, their "directly liable conduct," Doc. 53 at 9, seems to be based on

a supposition because of their names. And all these allegations are otherwise completely

conclusory and are not accompanied by any facts that would push these allegations across the line of plausibility. *See Iqbal*, 556 U.S. at 678.

Plaintiffs do not allege that any of these entities currently owns or operates the wind turbines about which they complain. Nor do they explain how their involvement at some point in the construction of the wind turbines renders them directly liable for nuisance under Kansas law. If these allegations were sufficient to do that, it would seem that any individual who had any part in the construction of the wind turbines, from the banker to the construction worker, could equally be liable for nuisance after the fact despite the fact they do not currently own or operate the wind turbine project.[10]

Plaintiffs seem to acknowledge that the project is owned and operated by Soldier Creek. *See* Doc. 53 at 4. But they also claim that the "real tortfeasors in these cases are the ones that decided to put the wind farm in the populated area" and that such decisions "were likely made high up by officers and directors of the richer NextEra parent corporations, not just by the lowest subsidiary entity Defendant Soldier Creek Wind LLC." *Id.* at 3. But Plaintiffs have pleaded no facts—nor offered any legal argument—that support any plausible claims against NextEra Defendants. Indeed, they seems to acknowledge that much of their case is just a hunch at this point, as they argue that "Defendants have exclusive knowledge of who made these decisions and when, as well as who carried the decisions out" and that the "assertions in their joint motions require a denial until further discovery can definitively determine critical material facts." *Id.* at 5-6; *see also id.* at 19 ("As to the corporate involvement of each Defendant, this also involves the concept of

---

[10]   Based on the allegations, it appears that none of the wind turbines at issue are built on land actually owned by Defendants. Rather, they are built with permission on land owned by third parties—the so-called "participating landowners" for the project. Neither party addresses, and thus the Court does not consider at this stage, whether any nuisance claim is properly aimed at the owner and operator of the wind turbines, or the owners of the land on which they sit.

'peculiar knowledge' of Defendant corporations. Only the Defendants[] know how the key decisions were made, and by whom, to pick on the good people of Nemaha County . . . ."); *id.* at 20 ("They are using a motion to dismiss to conduct a shell game with the details of what person from which corporation did this to Plaintiffs. Discovery is needed to flesh it out."). But hopes of fruitful discovery is not enough. *Iqbal*, 556 U.S. at 678-79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Plaintiffs finally argue that the "totality of evidence" shows a "clear disregard of the corporate entities justifying a full denial of their joint motions to dismiss." Doc. 53 at 19. They suggest that the Defendants' collective dishonesty shows they cannot "be trusted to not, mislead, [sic] on everything else to include the direct involvement in this and other massive Kansas development investment projects . . . ." *Id.* Such aspersions—which are sprinkled throughout the briefs on both sides—are not welcome or helpful. More importantly, the issue currently before the Court is the quality of Plaintiffs' allegations, not Defendants' credibility or character. Because Plaintiffs have not pleaded facts suggesting that NextEra Defendants are the owners or operators of the wind turbines about which they complain, nor have they pleaded facts showing a basis for joint and several liability, a joint venture or common enterprise, or direct action by NextEra Defendants, their claims against NextEra Defendants are dismissed.

## 2.    Soldier Creek

Defendants alternatively argue that Plaintiffs fail to state a claim for nuisance. Because the Court has concluded that there are no facts alleging that any NextEra Defendant is the owner or operator of the project, or any other grounds for liability as to Next Era Defendants, the Court

considers this argument only as to Soldier Creek, who the parties agree is the owner and operator of the project in Nemaha County.

"Intentional private nuisance is a tort relating to the intentional and unlawful interference with a person's use or enjoyment of his or her land." *Byers v. Snyder*, 237 P.3d 1258, 1268 (Kan. Ct. App. 2010). It has four elements:

> (1) [T]he defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) there was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) the interference that resulted and the physical harm, if any, from that interference proved to be substantial; and (4) the interference was of such a nature, duration, or amount as to constitute unreasonable interference with the use and enjoyment of the land.

*N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 697 F.3d 1259, 1267 (10th Cir. 2012) (citation omitted). Plaintiffs allege in the alternative nuisance based on negligence. Doc. 60 at ¶¶ 46-52.[11]

Defendants argue that Plaintiffs fail to state any nuisance claims because their allegations are entirely conclusory. Other than stating that wind turbines are a certain distance from Farm 1 and Farm 2, Defendants argue that Plaintiffs do not specifically state what harm they have suffered. Doc. 48 at 9. Defendants argue Plaintiffs only generally complain of wind farms but do not identify any nuisance, particularly as to Plaintiffs Casey and Sharon Bloom, who "apparently have no dwelling on their property," and have not alleged that wind turbines affect their ability to operate a farming operation. *Id.* at 10; *see also* Doc. 56 at 3-5; Doc. 57 at 13-15. Further, the fact that

---

[11] Defendants state that negligent acts cannot constitute a nuisance under Kansas law. *See, e.g.*, Doc. 48 at 13. But the Kansas Supreme Court has stated that a nuisance can be based on a negligent act. *United Proteins, Inc. v. Farmland Indus., Inc.*, 915 P.2d 80, 85 (Kan. 1996); *see also Culwell v. Abbott Const. Co.*, 506 P.2d 1191, 1196 (Kan. 1973) ("In other words a nuisance may result from conduct which is intentional or negligent or conduct which falls within the principle of strict liability without fault. The point is that nuisance is a result and negligence is a cause and they cannot be distinguished [otherwise]."); *Macias v. BNSF Ry. Co.*, 2020 WL 3469680, at *8 (D. Kan. 2020) ("But a private nuisance action may be brought on a theory of intentional conduct, negligence or strict liability.").

Plaintiffs can hear or see wind turbines from their property does not state a claim for nuisance. Doc. 48 at 10-11. Defendants also argue that allegations that Plaintiffs' property is not as quiet and peaceful as it was before the construction of the project is not sufficient to state a claim for nuisance under Kansas law. Doc. 56 at 4; Doc. 57 at 14

The Court concludes that the corrected second amended complaint states a claim for nuisance as to Plaintiffs Matthew and Rachel Bloom. Plaintiffs Matthew and Rachel Bloom allege that the wind turbines have caused constant and annoying noise, interrupted quail hunting on the property, and stymied their plans for an addition to the residential dwelling on Farm 1 because they "cannot figure out a way to do so without being subject directly to the interference and annoyance of the looming wingspan, noise, and shadow of the massive turbine tower in question." Doc. 60 at ¶¶ 17-21, 34. Although somewhat sparse, this states a claim for nuisance.

However, the corrected second amended complaint effectively contains no allegations specific to Plaintiffs Casey and Sharon Bloom and Farm 2, other than that they run farming operations on the property and a wind turbine was built less than 600 feet from their property line. *Id.* ¶¶ 2, 42. There are no allegations as to how the wind turbines have interfered with the use of Farm 2. Although the standard at this stage is only plausibility, a claim must still be accompanied by sufficient factual conduct to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plaintiffs Casey and Sharon Bloom have failed to do that, and their nuisance claims must be dismissed.

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff Matthew and Rachel Bloom's nuisance claim as to Soldier Creek but grants the motion as to Plaintiff Casey and Sharon Bloom.

### C.        Inverse Condemnation

Finally, the corrected second amended complaint asserts a claim for "inverse condemnation under government authority." Doc. 60 at ¶¶ 53-57. Plaintiffs allege the project at issue was a "public works project" that required resolution of local land use and county permitting issues, and that Defendants misled the Nemaha County Board of Supervisors. According to Plaintiffs, "[b]y undertaking the responsibilities and actions to inform the Board on such matters, NextEra Defendants were acting under authority of the Board" on various matters and "readily undertook to act in this specific capacity and circumstance that directly affected Plaintiffs under color of government authority." *Id.* Plaintiffs contends that the placement of wind turbines at locations less than the agreed set-back distance is a taking under the 5th Amendment and under Kansas law that Defendants are liable for because they "caused the government to 'agree' to, and thus authorize, these takings." *Id.*

An inverse-condemnation claim is essentially the reverse of an eminent-domain claim. Eminent domain refers to the power "of a governmental entity to take private property for public use without the owner's consent upon payment of just compensation." *Garrett v. City of Topeka*, 916 P.2d 21, 30 (Kan. 1996). In an eminent-domain action, the governmental entity institutes the action to take property. *Estate of Kirkpatrick v. City of Olathe*, 215 P.3d 561, 565 (Kan. 2009). By contrast, inverse-condemnation proceedings are bought by the party who owns property to allege that the property was taken for public use without the initiation of condemnation proceedings by the governmental entity. *Id.*; *see also Mid Gulf, Inc. v. Bishop*, 792 F. Supp. 1205, 1212 (D. Kan. 1992) ("Kansas courts have routinely held that for inverse condemnation to lie, it is usually required that an entity with eminent domain authority acquire possession of the property in question and control the property to the exclusion of the owner.").

Defendants move to dismiss this claim because they are not a governmental entity that could effect a taking of property, nor do they have the power of eminent domain. Doc. 48 at 14; Doc. 50 at 20-21. Plaintiffs argue that there is no requirement that an inverse-condemnation claim "cannot be brought against a private entity who participates in the taking if acting under governmental authority." Doc. 53 at 27.

But in *Macias*, a case cited by Plaintiffs in the corrected second amended complaint, the plaintiffs tried to assert an inverse-condemnation claim against a railroad because it "worked in tandem" with the governmental entity. 2020 WL 3469680, at *9. The court dismissed the railroad because there were no allegations that it was a governmental entity or acted with governmental authority. *Id.* Despite the plaintiffs' argument that the railroad worked with the governmental entity, "this allegation does not suggest that [the railroad] somehow had the authority to take private property through condemnation proceedings." *Id.* The same is true in this case. Although Plaintiffs allege that Defendants somehow manipulated governmental authorities to allow them to build wind turbines, there are no allegations that Defendants have—or had—the authority to take property through condemnation proceedings.[12] Further, although Plaintiffs allege that Defendants had to work with government officials to resolve "certain local land use and county permitting issues for the use of land, roadways, and other facilities," this is not sufficient to convert Defendants' private project into a government taking. If Plaintiffs' argument were correct, any request for zoning changes or permits could open up any private development to claims of inverse condemnation.

---

[12] Plaintiffs' allegation that Defendants acted "under color of government authority," Doc. 60 at ¶ 54, is conclusory and unsupported by facts that would make this allegation plausible.

Plaintiffs rely on three cases to support their theory that they can assert an inverse-condemnation claim against a private entity. The first is *Kelo v. City of New London, Conn.,* 545 U.S. 469 (2005). Plaintiffs cite this case for the holding that "a state could legally take a person's property and give it to another for a public use," but that the Constitution requires that "the victims receive just compensation." Doc. 53 at 26. But *Kelo* involved a private development entity that had been authorized to initiate—and had initiated—condemnation proceedings. *Kelo*, 545 U.S. at 475. Here, however, there are no allegations that anyone—whether a governmental entity or Defendants—have initiated condemnation proceedings or exercised the power of eminent domain.

The second is *Ossman v. Mountain States Telephone & Telegraph Co.*, 511 P.2d 517 (Colo. App. 1973).[13] That case involved a landowner suing a phone company for trespass. *Id.* at 519. The phone company argued that the landowner's only cause of action was for inverse condemnation. *Id.* The court found that the phone company's defense should be treated as a counter-petition for eminent domain. *Id.* If the taking was deemed not proper, the plaintiff's trespass claim could continue. *Id.* at 520. But if the taking was proper, the landowner could still get condemnation damages. *Id.* The Court struggles to see the relevance of this case to the current dispute. In *Ossman*, there was no dispute that the phone company had the power of eminent domain (though the plaintiff argued it refused to use it). *Id.* at 518. Defendants do not have that power here, which is why they argue an inverse-condemnation claim against them cannot lie.[14]

The third is *George Ward Builders, Inc. v. City of Lee's Summit*, 157 S.W.3d 644 (Mo. Ct. App. 2004). But the Court again struggles to see the relevance of this case to the current dispute.

---

[13] The Colorado Supreme Court reversed this Colorado Court of Appeals decision. *Ossman v. Mountain States Tel. & Tel. Co.*, 520 P.2d 738 (Colo. 1974). Plaintiffs don't address this, but as discussed, the Colorado Court of Appeals decision is not on point in any respect.

[14] Plaintiffs also cite *Ossman* for its reliance on *Garden Water Corp. v. Fambrough*, 245 Cal. App. 2d 324 (Cal. Dist. Ct. App. 1966). But that case only speaks to inverse condemnation generally—it does not address whether a private party can be sued for inverse condemnation. *Id.* at 326-27.

In *George Ward Builders*, a landowner sued a city because the city's park lights were creating a nuisance. *Id.* at 646. The issue was whether a nuisance action could be brought against a municipality, and the court found that was not proper because "when private property is damaged by a nuisance operated <u>by a public entity with condemning authority</u>, regardless of whether the nuisance is temporary or permanent, the exclusive and proper remedy is inverse condemnation." *Id.* at 650 (emphasis added). This doesn't address the issue here, where the alleged nuisance is owned and operated by a private entity.

In sum, Plaintiffs have not shown that they may assert an inverse-condemnation claim against a private entity who has not—and could not—initiate condemnation proceedings or exercise the power of eminent domain. This claim must be dismissed.[15]

## IV.     CONCLUSION

The Court dismisses NextEra Defendants because they are not the owner or operator of the project, and because NEC and NECH are not subject to personal jurisdiction of this Court. The Court dismisses Plaintiffs' claim for inverse condemnation. Plaintiffs Matthew and Rachel Bloom's nuisance claims against Soldier Creek survive. Plaintiffs Casey and Sharon Bloom's nuisance claims against Soldier Creek are dismissed. The remaining parties are Plaintiffs Matthew and Rachel Bloom and Defendant Soldier Creek, and the surviving claim is a claim for nuisance.

THE COURT THEREFORE ORDERS that Defendants NEC, NEOS, NEPM, and Soldier Creek's Motion to Dismiss the Second Amended Complaint for Failure to State a Claim (Doc. 47) is GRANTED IN PART AND DENIED IN PART.

---

[15]   Plaintiffs contend that this claim is only asserted as an alternative to his private nuisance claim, because even if Defendants are correct that the wind turbines are not nuisances, "they still have to pay the Blooms for taking away the use and enjoyment of their property under the Fifth and Fourteenth Amendments to the U.S. Constitution." Doc. 53 at 26. Although it's unclear how there would be a compensable taking if there was no nuisance, Plaintiffs may not sustain a legally untenable claim just because it is asserted in the alternative.

THE COURT FURTHER ORDERS that Defendants NEE, NECH, and NEER's Motion to Dismiss the Second Amended Complaint for Lack of Personal Jurisdiction and Failure to State a Claim (Doc 49) is GRANTED IN PART AND DENIED IN PART.[16]

IT IS SO ORDERED.

Dated: July 25, 2022                    /s/ *Holly L. Teeter*
                                        HOLLY L. TEETER
                                        UNITED STATES DISTRICT JUDGE

---

[16] "Courts have discretion under 28 U.S.C. § 1631 to cure jurisdictional defects by transferring a case to a district where it could have been brought." *Tomelleri v. MEDL Mobile, Inc.*, 657 F. App'x 793, 796 (10th Cir. 2016). Neither party discusses or advocates for a transfer under section 1631. In the interest of completeness, the Court does not find that transfer is appropriate as to the dismissed claims and parties. Section 1631 refers to transfer of an "action" and the Court has found that some of Plaintiffs' claims survive and will remain in the District of Kansas. The Court has also found that Plaintiffs have failed to state a claim against the dismissed parties because they are not the owner or operator of the project.